# EXHIBIT 10

# Brooklyn Journal of Corporate, Financial & Commercial Law

Volume 16 | Issue 2                                                                                          Article 4

6-2-2022

# Signed, Sealed, & Undelivered: Unsuccessful Attempts of Foreign Judgment Recognition Between the U.S. and China

Shun-Hsiang Chen

Follow this and additional works at: https://brooklynworks.brooklaw.edu/bjcfcl

 Part of the International Law Commons, and the International Trade Law Commons

## Recommended Citation

Shun-Hsiang Chen, *Signed, Sealed, & Undelivered: Unsuccessful Attempts of Foreign Judgment Recognition Between the U.S. and China*, 16 Brook. J. Corp. Fin. & Com. L. 167 (2022).
Available at: https://brooklynworks.brooklaw.edu/bjcfcl/vol16/iss2/4

This Note is brought to you for free and open access by the Law Journals at BrooklynWorks. It has been accepted for inclusion in Brooklyn Journal of Corporate, Financial & Commercial Law by an authorized editor of BrooklynWorks.

# SIGNED, SEALED, & UNDELIVERED: UNSUCCESSFUL ATTEMPTS OF FOREIGN JUDGMENT RECOGNITION BETWEEN THE U.S. AND CHINA

## ABSTRACT

*With the growth of international trade between the United States and China, the issue of not having a reciprocity system for recognition and enforcement of foreign judgments between the two countries has become increasingly more prevalent. Since ratifying the New York Convention, parties from both countries have primarily relied on arbitration to settle disputes. However, as trade continuously expands, the need for a reciprocal system for foreign judgments expands alongside it. This note addresses the history of the Hague conventions and the attempts to resolve foreign judgment recognition and enforcement on a multilateral scale. The note then continues discussing how the United States and China recognize and enforce foreign judgments. On the international level, both the United States and China have signed the 2005 Choice of Court Convention; but neither have ratified it since the resulting treaty contained ambiguous provisions. To correct and clarify provisions of the Choice of Court Convention, the Hague Conference held the Convention of 2 July 2019 on the Recognition and Enforcement of Foreign Judgments in Civil or Commercial Matters. This note proposes that the United States and China should sign and ratify the 2019 Judgment Convention to ensure a reciprocal judgment recognition and enforcement system for foreign business conducted in each country, thereby protecting and strengthening future business between the two countries.*

## INTRODUCTION

The early 1970s witnessed the beginning of drastically increased trade relations between the United States and China. Starting in 1971, as a result of rapid institution-building and changes in the barriers that impaired the flow of goods between the United States and China, the two countries have increased their economic and financial ties to vastly improve their commercial relations.[1] In 1972, the trade volume between the two countries was at a meager \$4.7 million.[2] Several years later, in 1979, due to the signing of a bilateral trade agreement and economic reforms,[3] trade between the countries increased from approximately \$4 billion that year to over \$600

---

1. Dong Wang, *U.S.-China Trade: 1971-2012: Insights into the U.S.-China Relationship*, 11 Asia-Pacific J. 1, 2 (June 17, 2013).

2. *Id.*

3. Nicholas R. Lardy, *U.S.-China Economic Relations: Implications for U.S. Policy*, Brookings (Apr. 25, 2001), https://www.brookings.edu/testimonies/u-s-china-economic-relations-implications-for-u-s-policy.

billion in 2017.[4] Just one year later, even during the current trade tensions between the countries, the United States and China's goods and services trade totaled an estimated $737.1 billion.[5] In less than half of a century, the trade volume between the two countries increased by more than $736 billion.

Many have credited the exponential trade increase during the 1990s and 2000s to China's rapidly developing economic market, which significantly transformed China's position in the world economy. As a result, in 2012, China surpassed the United States as the largest trading nation in the world with the United States being its largest export market.[6] As trade between the countries continued to grow in the last half-century, tensions and disputes between the countries subsequently followed the trend. From the United States' perspective, trade disputes and tensions stem from China's incomplete transition to a free-market economy.[7] Although China has drastically liberalized their economic policies starting in the late 1970s, there are still several state-directed policies that seem to impede trade flow.

The growth of trade relations and subsequent trade reforms from each country have created difficulties for American companies operating in China and Chinese companies operating in the United States. One of the many difficulties associated is the forced market exclusion of some major sectors, including intellectual property,[8] leading to increased trade lawsuits brought to the World Trade Organization (WTO) beginning in 2002.[9] As of 2019, there has been a total of 23 cases with the United States as complainants against China, and 16 cases with China as the complainants.[10] Within the cases brought to the WTO, the United States has won 20 cases, and China has won only five cases with an additional three resulting in split decisions.[11] The problem associated with these "wins" is the inexistence of reciprocity for judgment recognition and enforcement between the two countries.

Although there has been a slight increase in deference and reciprocity between Chinese and U.S. courts,[12] there is no ratified treaty or agreement between the countries compelling each to recognize and enforce judgments

4. Gulnar Nagashybayeva & Bonni van Blarcom, *U.S. Trade with China: Selected* Resources, U.S. LIB. OF CONG. (June 7, 2019), https://guides.loc.gov/us-trade-with-china/introduction.

5. *The People's Republic of China: U.S.-China Trade Facts,* OFFICE OF THE U.S. TRADE REP., (last visited Sept. 30, 2020), https://ustr.gov/countries-regions/china-mongolia-taiwan/peoples-republic-china.

6. Wang, *supra* note 1.

7. WAYNE M. MORRISON, CONG. RSCH. SERV., RL33536, CHINA-U.S. TRADE ISSUES (2018).

8. Jonathan M. Baron, *U.S. China Conflict Has Only Just Begun*, CHIEF EXEC. (Aug. 13, 2020), https://chiefexecutive.net/u-s-china-conflict-has-only-just-begun/.

9. Jeffrey J. Schott & Euijin Jung, *The United States Wins More WTO Cases than China in US-China Trade Disputes*, PETERSON INST. FOR INT'L ECON. (Nov. 22, 2019), https://www.piie.com/research/piie-charts/united-states-wins-more-wto-cases-china-us-china-trade-disputes.

10. *Id.*

11. *Id.*

12. Terence Wong & Ya'nan Zhao, *The Current Status of Enforcing U.S. Judgments in China*, WINSTON & STRAWN LLP (Jul. 20, 2019), https://www.winston.com/en/thought-leadership/the-current-status-of-enforcing-us-judgments-in-china.html.

rendered in the other country. Each country sets its own laws on recognizing and enforcing foreign court judgments. Generally, including civil matters, the United States' recognition and enforcement of foreign judgments depend on whether the U.S. courts have a "long-arm" basis of personal jurisdiction over the case.[13] There is a presumption in favor of recognition established in *Hilton v. Guyton,*[14] but jurisdiction ultimately depends on state law that differs from state to state.[15]

On the other hand, China has regularly denied recognition and enforcement of foreign judgments based on reciprocity or public policy.[16] To recognize and enforce foreign judgments, other countries, including the United States and China, have relied on signing several conventions or bilateral treaties; entering into Memoranda of Guidance; or obtaining judgments from international commercial courts.[17]

Most recently, finalized in 2019, the Convention of 2 July 2019 on the Recognition and Enforcement of Foreign Judgments in Civil or Commercial Matters (2019 Judgment Convention) attempted to create predictable and enforceable rules for the recognition and enforcement of judgments in civil and commercial matters among its member states.[18]

In order to provide adequate protection and assurance to people conducting business between the United States and China, the two countries should sign and ratify the 2019 Judgment Convention so that a treaty is binding over the countries, resulting in a simplified and reciprocal foreign judgment enforcement and recognition process between the two countries.

Part I of this Note details the history of the Hague Conventions and their ineffectiveness, starting with the 1971 Hague Convention of Recognition and Enforcement of Foreign Judgments in Civil and Commercial Matters. Part II

---

13. "Long arm" jurisdiction refers to the ability of domestic courts to exercise jurisdiction over an out-of-state defendant, provided the individual defendant has sufficient minimum contacts with the forum state to satisfy the constitutional standard established in *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

14. Hilton v. Guyot, 159 U.S. 113, 210 (1895). The case is discussed in further detail later in this Note, but the Court sets forth the requirements for recognition of foreign judgments and refused to recognize judgments that failed reciprocity.

15. Sarah E. Coco, *The Value of a New Judgment Convention for U.S. Litigants*, 94 N.Y.U. L. REV. 1209, 1217 (2019).

16. China adheres to a strict reciprocity system, which essentially requires petitioner's judgment country having recognized Chinese judgments as precedent for Chinese courts to enforce its judgment. *See* ASIAN BES. L. INST., RECOGNITION & ENF'T OF FOREIGN JUDGMENTS IN ASIA 4, 51, 55–56 (Adeline Chong ed., 2017).

17. Anselmo Reyes & Kevin Tan, *Recognition and Enforcement of International Commercial Court Judgments*, 79 IUS GENTIUM 31, 33–38 (2020).

18. *See* Hague Conference on Private International Law, Convention on the Recognition and Enforcement of Foreign Judgments in Civil or Commercial Matters, opened for signature July 2, 2019, not yet in force, https://assets.hcch.net/docs/806e290e-bbd8-413d-b15e-8e3e1bf1496d.pdf; *see also Overview of the Judgments Project*, HAGUE CONF. ON PRIV. INT'L L., https://assets.hcch.net/docs/905df382-c6e0-427b-a5e9-b8cfc471b575.pdf (last visited November 12, 2020) (describing the goals of the Judgments Convention).

discusses the American rules on foreign judgment recognition and enforcement and its evolution from the 1958 New York Convention to the 2005 Uniform Foreign-Country Money Judgments Recognition Act. Part III will discuss the Chinese rules on foreign judgment recognition and enforcement starting with China's adoption of their Civil Procedure Law of 1982 and its 1991 amendment, continuing with China's refusal of foreign judgment enforcement. Finally, Part IV details the 2019 Judgment Convention and how each country will benefit from signing and ratifying the convention, as well as addresses arguments opposing the signing and ratification of the 2019 Judgment Convention and why these arguments should not hinder the United States and China from doing so.

## I. HISTORY OF NEGOTIATING HAGUE JUDGMENT CONVENTIONS

### A. 1951 HAGUE CONFERENCE ON PRIVATE INTERNATIONAL LAW

The idea of having multilateral agreements with rules exercising recognition and enforcement of resulting foreign judgments dates back to 1893 when the Hague Conference first attempted to address this with conventions.[19] In October of 1951, the Hague held its Seventh Conference on Private International Law (1951 Hague Convention), dealing with topics including conflicts between national and domiciliary laws and civil procedure.[20] With its overall purpose of setting progressive unification of rules for private international law, fifteen European governments participated, in addition to representatives from Japan.[21] This was a positive step in the right direction, except for one flaw. One of the most notable features and a reason for the ineffectiveness of the 1951 Conference was the absence of the United States.[22] Additionally, another drawback that likely limited other countries from participating was that the proceedings were conducted in French, so the participants that did not understand French were unsure when to support or challenge the proposal.[23] Without the appropriate support and acceptance, subsequent conferences essentially rendered the 1951 Conference useless. Two decades later, the Hague Conference held the Convention on the Recognition and Enforcement of Foreign Judgments in Civil and Commercial Matters (1971 Hague Convention).

---

19. K. H. N., *The United States and the Hague Conferences on Private International Law*, 1 AM. J. COMP. L., 268, 268 (1952).
20. *Id.*
21. B.A. Wortley, *The 1951 Hague Conference on Private International Law*, 38 PROBS. OF PUB. & PRIV. INT'L L. at 25-46 (1952).
22. K. H. N., *supra* note 20, at 268.
23. Wortley, *supra* note 22, at 40.

### B.    CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN JUDGMENTS IN CIVIL AND COMMERCIAL MATTERS OF 1971

In 1971, the Hague Conference held the Convention on the Recognition and Enforcement of Foreign Judgments in Civil and Commercial Matters hoping to put forward uniform rules on recognition and enforcement of foreign civil judgments amongst its member states; but, like the previous conventions, it also failed.[24] Unlike other conventions, a notable feature of the 1971 Hague Convention was that it operated without the need for an exclusive choice of court agreement,[25] making it easier for parties to settle disputes. However, although the 1971 Hague Convention was intended as a multilateral treaty that facilitates mutual recognition and enforcement, it ended up combining both multilateral and bilateral elements as it was negotiated multilaterally but enforced bilaterally.[26] As a consequence, even if countries have signed the multilateral treaty, in order to enforce the treaty, states would still have to spend additional time creating bilateral agreements with other states.[27] Besides the time-consuming nature of creating additional bilateral agreements with member states to supplement the multilateral treaty, another issue associated with the 1971 Hague Convention was that it was not widely accepted, as only five parties have signed as of present.[28]

### C.    2005 HAGUE CONVENTION ON CHOICE OF COURT AGREEMENTS

After years of negotiating, the drafters of the Hague Conferences switched their focus to a convention on jurisdiction based on the agreement of the parties, such as a forum selection agreement.[29] The drafters' change of direction led to another multilateral convention known as the 2005 Convention on Choice of Court Agreements (2005 Hague Convention).[30] The primary purpose of this convention was to ensure that the choice of forum agreements were as effective as they could be in international business transactions.[31] Another one of its objectives was to create a litigation counterpart to the New York Convention and what it did for choice of forum

---

24.  Paul R. Dubinsky, *Private Law Treaties and Federalism: Can the States Lead?*, 54 TEX. INT'L L.J. 39, 62 (2018).

25.  Reyes & Tan, *supra* note 17, at 35.

26.  Arthur von Mehren, *Recognition and Enforcement of Foreign Judgments: A New Approach for the Hague Conference?*, 57 L. & CONTEMP. PROBS. 271, 275 (1994).

27. *Id. See also* Reyes & Tan, *supra* note 17, at 35; Yuliya Zeynalova, *The Law on Recognition and Enforcement of Foreign Judgments: Is It Broken and How Do We Fix It?*, 31 BERKELEY J. INT. L., 150, 182 (2013).

28.  Reyes & Tan, *supra* note 17, at 35.

29.  Zeynalova, *supra* note 28, at 183.

30.  Ronald A. Brand, *Comparative Method and International Litigation*, 2020 J. DISP. RESOL. 273, 276 (2020).

31.  Jeffrey Talpis & Nick Krnjevic, *The Hague Convention on Choice of Court Agreements of June 30, 2005: The Elephant That Gave Birth to a* Mouse, 13 SW. J. L. & TRADE AM. 1, 7 (2006).

agreements in arbitration agreements.[32] Similar to the New York Convention, the 2005 Hague Convention established rules for enforcing private party agreements regarding forum selection for disputes, as well as rules for recognition and enforcement of the selected forum's decision.[33]

The 2005 Hague Convention attempted to provide predictability to the effectiveness of agreements like forum selection by establishing uniform rules.[34] Only when the parties to international business transactions have entered in exclusive choice of court agreements designating a member state's court as the forum for dispute resolution would the 2005 Hague Convention apply.[35] Unless the agreement is null and void under the member state's law, the Convention requires the court to exercise jurisdiction.[36] Promising to protect parties to international transactions, the 2005 Hague Convention intended to just abide by the agreed-upon forum for dispute resolution.[37] There are 31 states and one regional organization (the European Union) that are parties to the convention.[38] Of those 31 states and the European Union, seven signed with only two ratifications.[39]

The United States and China are both among the several states that have signed the 2005 Hague Convention, with the United States doing so in 2009 and China in 2017.[40] Like the many conventions before the 2005 Hague Convention, it did not and has not garnered the widespread acceptance necessary to make as great of an impact it originally intended. China may not have ratified the 2005 Hague Convention due to the existing 36 bilateral agreements it has already entered with countries such as France, Italy, and Russia that provide for the recognition and enforcement of judgments.[41] For the United States, their reasoning for not ratifying the treaty is most likely due to federalism and the power struggle between the state and federal governments. Only the President has the power to make treaties but still requires two-thirds consent of the Senate.

During the Obama administration, the United States intended to ratify the treaty until discussions with the Secretary of State's Advisory Committee

---

32. *Id.* The New York Convention is a treaty for the recognition and enforcement of foreign arbitral awards intended to unify the standards by which awards are observed and enforced in the signatory countries.

33. *Id.*

34. *Id.* The uniform rules determined (i) the circumstances a court must enforce a choice of forum agreement, (ii) when a court could potentially refuse enforcement, and (iii) when it must enforce a decision rendered by a foreign member court.

35. Reyes & Tan, *supra* note 17, at 34–35. *See also* Dubinsky, *supra* note 25, at 69–70.

36. Reyes & Tan, *supra* note 17, at 35.

37. Dubinsky, *supra* note 25, at 69.

38. Reyes & Tan, *supra* note 17, at 34.

39. *Convention of 2 July 2019 on the Recognition and Enforcement of Foreign Judgments in Civil or Commercial Matters*, https://www.hcch.net/en/instruments/conventions/status-table/?cid =98.

40. *Id.*

41. Reyes & Tan, *supra* note 17, at 34.

resulted in the demand that the treaty be implemented through state legislation.[42] Previously, federal statutes implementing the different Hague Conventions had followed a concurrent jurisdiction model where either state or federal courts could adjudicate the actions.[43] In its efforts to be the sole source of substantive law on the recognition of foreign judgments with the 2005 Hague Convention, the Uniform Law Commission drafted a Uniform Act to represent its position.[44] Following the proposed Uniform Act, the United States Department of State set forth limiting conditions such as requiring the state legislation to be as nearly identical as possible to the federal statute.[45] After those discussions, plans to ratify the treaty stalled as neither the treaty nor proposed legislation implementation were sent to Congress.[46] To date, both the United States and China have signed the 2005 Hague Convention but neither have ratified the convention.[47]

Part I of this Note analyzed the history of the Hague Conventions and some of the benefits and drawbacks of several conventions. Although the United States came close to ratifying the 2005 Hague, it ultimately failed to do so. Next, this Note will examine the American rules on foreign recognition and enforcement exhibited through its conventions and acts, focusing on the need for reciprocity between the United States and China to enforce foreign judgment recognitions.

## II.  AMERICAN RULES ON FOREIGN JUDGMENT RECOGNITION AND ENFORCEMENT

Starting in the 1950s, the United States made several attempts to create a system for foreign judgment recognition and enforcement. Although with arbitral awards, one of their first attempts was with the New York Convention, which focused on creating a system of mutual recognition and enforcement. Since the New York Convention, the United States has enacted several foreign judgment recognition and enforcement laws, which some states have codified into their own laws.[48]

---

42. Dubinsky, *supra* note 25, at 70.
43. *Id.* at 71.
44. *Id.*
45. *Id.* at 72.
46. *Id.* at 70.
47. Brand, *supra* note 31, at 276.
48. Charles W. Mondora, *The Public Policy Exception, "The Freedom of Speech, or of the Press," and the Uniform Foreign-Country Money Judgments Recognition Act*, 36 HOFSTRA L. REV. 1139, 1139 (2008).

### A. THE UNITED NATIONS CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS – THE "NEW YORK CONVENTION"

Although the 1951 Hague Convention was meant to set uniform laws for international private law, one of its many setbacks was the absence of the United States, a prominent player in international trade, in the proceedings.[49] Several years later, in 1958, the United Nations held the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York Convention) as an attempt by businesses to achieve a non-judicial solution for their international disputes.[50] A treaty for the recognition and enforcement of foreign arbitral awards was highly sought after at that time as many nations refused to enforce the arbitral agreements if litigation had already been instituted in their local court, and businesses feared potential discrimination and biases levied against them when seeking foreign judicial remedies.[51]

Attended by 45 nations including the United States and Soviet Russia, the United Nations held the New York Convention "to encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries."[52] Now, with over 145 parties in the convention, it is regarded as one of the most successful commercial treaties in the world.[53] The fundamental purpose of the New York Convention was to remove the limits set by the Geneva Treaties and to promote better and more efficient award enforcement procedures.[54] The New York Convention expanded to include both commercial and non-commercial matters and to allow enforcement in any state regardless of whether the parties were subjected to the jurisdiction of the different state.[55]

During the discussions to format the proposed convention, the United States purposely took a limited role as it was concerned with the convention's feasibility within the United States' federal-state system and the possibility

---

49. K.H.N., *supra* note 20, at 268.

50. Leonard V. Quigley, *Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 70 YALE L. J. 1049, 1049 (1961).

51. *Id.* at 1051.

52. Gary B. Born, *The New York Convention: A Self-Executing* Treaty, 40 MICH. J. INT'L L. 115, 119 (2018) (quoting Scherk v. Alberto-Culver Co., 417 U.S. 506, 520 (1974)). *See also* Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 658 (1985).

53. S.I. Strong, *Beyond the Self-Execution Analysis: Rationalizing Constitutional, Treaty, and Statutory Interpretation in International Commercial Arbitration*, 53 VA. J. INT'L L. 499, 504 (2013).

54. Lionel M. Schooler, *How We Got Here*, 25 DISP. RESOL. MAG. 8, 9 (2019). The Geneva Protocol is a treaty established by the League of Nations that attempted to unify international commercial arbitration but left a significant gap of inability to guarantee the enforceability of a resulting award.

55. *Id.*

that other states would not uniformly adopt the rules.[56] It was not until 1968, a decade after its drafting, that the United States Senate finally agreed to ratify the New York Convention and thereafter enacted Chapter Two of the Federal Arbitration Act to implement the arbitral rules.[57] During this decade, American businesses became increasingly wary about their ability to enforce arbitral awards outside the United States.[58]

Since taking effect in 1970, the treaty has been binding on all United States courts as the "supreme law of the land."[59] As such, courts must be cautious before interpreting domestic legislation in a manner so as not to violate international agreements.[60] Although not directly related to recognition and enforcement of foreign judgments, the New York Convention was a progressive effort towards accomplishing uniform standards in international disputes. The Supreme Court first mentioned the New York Convention in 1974, in *Scherk v. Alberto-Culver Co.*, dealing with a dispute in international trade.[61] In *Scherk*, an American company sought to recover damages based on fraud concerning trademarks in violation of the Securities Exchange Act.[62] The Court relied on its reasoning and decision in *M/S Bremen v. Zapata Off-Shore Co.* [63] to reach its decision in *Scherk*. Ultimately, the Court held that Scherk's claims of Securities Exchange Act violations fell within the scope of the Federal Arbitration Act.[64] Even though the Court did not specifically address the New York Convention, because the Senate implemented the Convention's arbitral rules into the FAA in 1970, the Court's *Scherk* decision was the initial starting point of the United States' judicial recognition of the New York Convention.

When the Supreme Court decided its 1985 landmark case of *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*, it had its first official opportunity to directly review and apply the New York Convention. In *Mitsubishi*, the Court was presented with the question of arbitrability, pursuant to the FAA and the New York Convention, of claims arising under the Sherman Act that

---

56. *Id. See* Born, *supra* note 53, at 117.

57. Christopher R. Drahozal, *The New York Convention and the American Federal System,* 2012 J. DISP. RESOL. 101, 103 (2012).

58. Schooler, *supra* note 55, at 9.

59. *See* Riley v. Kingsley Underwriting Agencies, Inc*.*, 969 F.2d 953, 958 (10th Cir. 1992) (noting "ratification of the Convention makes it part of the supreme law of the land, as enforceable as Congressional enactments").

60. Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 539 (1995).

61. Scherk v. Alberto-Culver Co., 417 U.S. 506, 509 (1974).

62. *Id.*

63. *See* M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 7, 15 (holding that absent a strong showing that it should be set aside, a voluntarily adopted forum clause should control). In *Bremen*, the Court rejected the idea that a forum-selection clause would not be enforced in the United States unless the selected state would provide a more convenient forum. The Court sought to eliminate any uncertainties by agreeing that the forum accepted by both parties is an indispensable element in international trade.

64. Schooler, *supra* note 55, at 10.

included a valid arbitration clause.[65] The Court acknowledged the New York Convention's arbitral rules allowing the refusal of enforcement where the "recognition or enforcement of the award would be contrary to the public policy of that country."[66] However, the Court decided that the claims were arbitrable pursuant to the Arbitration Act as concerns of international comity and the need for predictability in the international commercial system all require the enforcement of the arbitration clause in question.[67] The Court again referred to the *Bremen* decision pertaining to the forum clause and how an advance agreement is an "indispensable element in international trade and commerce."[68]

### B. 1962 UNIFORM FOREIGN-MONEY JUDGMENT RECOGNITION ACT AND ITS 2005 REVISION

Many viewed the New York Convention as a success in international commercial transactions,[69] but the Convention focused on arbitration and arbitral awards, not litigation or civil judgments. In 1962, four years after the drafting of the New York Convention, the United States enacted the Uniform Foreign-Money Judgment Recognition Act (1962 Uniform Act) in which it officially recognized and enforced foreign money judgments.[70] In the interest of convenience, the 1962 Uniform Act intended to standardize the country's treatment of foreign country judgments, while hoping to gain wider acceptance of United States' judgments abroad.[71] Prior to its 2005 revision, there were 17 states that adopted the 1962 Uniform Act.[72] The 1962 Uniform Act only applied to money judgments, and explicitly excluded judgments for taxes, fines or penalties, as well as judgments for matrimonial or family matters.[73]

Under the 1962 Uniform Act, a foreign judgment was subject to a limited scope inquiry prior to a court's ruling about whether it should be

---

65. *Mitsubishi*, 473 U.S. at 616.

66. Treaty on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517. According to Article V(2) of the Convention, "Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that: (a) The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or (*b*) The recognition or enforcement of the award would be contrary to the public policy of that country." *See also* Scherk, 417 U.S. at 519.

67. *Mitsubishi*, 473 U.S. at 629.

68. Schooler, *supra* note 55, at 13–14.

69. Strong, *supra* note 54, at 504.

70. Jay M. Zitter, *Construction and Application of Uniform Foreign Money-Judgment Recognition Act*, 88 A.L.R.5th 545, § 2(a).

71. Mondora, *supra* note 49, at 1146; Richard J. Graving, *The Carefully Crafted 2005 Uniform Foreign-Country Money Judgments Recognition Act Cures a Serious Constitutional Defect in its 1962 Predecessor*, 16 MICH. ST. J. INT'L L. 289, 290–291 (2007).

72. Daniel J, Smith, *Invalidity of Judgment of Court of Foreign Country*, 9 AM. JUR. PROOF OF FACTS 3d 677 § 4.

73. Uniform Foreign Money-Judgments Recognition Act § 1(2) (1962).

recognized.[74] Unless satisfying one of the grounds for non-recognition, member states were required to apply money judgments from other member states.[75] Mandatory grounds for non-recognition included lack of personal jurisdiction and lack of due process in the foreign court, while discretionary grounds for non-recognition included lack of notice to defendant, public policy, and fraud.[76] These exceptions were intended to balance each member states' desire to enforce only those judgments that followed their own specific laws with the understanding that the world had many different cultures and legal systems.[77] This acknowledgment of varying cultures and legal systems was unfortunately unable to offset the defects associated with the 1962 Uniform Act. An important and noticeable defect of the 1962 Uniform Act was that it failed to provide a judicial procedure for the court to follow in deciding on the qualification for recognition.[78] Instead, courts generally first looked to state statutes adopting the 1962 Uniform Act to determine recognition.[79]

The 1962 Uniform Act did provide standards for recognition but omitted ways to apply the standards in accordance with due process.[80] This omission led to great discrepancies among the states in interpreting the 1962 Uniform Act, resulting in courts holding differently on the definition of a foreign state. Some courts, while interpreting § 1(1) of the 1962 Uniform Act, found that the definition of "foreign state" precluded any application of the act to the judgments of other states in the United States.[81] Other courts conversely held that the definition under § 1(1) of the 1962 Uniform Act did not preclude application to judgments of sister states.[82] As a result, the 1962 Uniform Act

---

74. *See* Bank Melli Iran v. Pahlavi, 58 F.3d 1406, 1409 (9th Cir. 1995).

75. Uniform Foreign Money-Judgments Recognition Act § 3 (1962).

76. Uniform Foreign Money-Judgments Recognition Act § 4 (1962); Coco, *supra* note 15, at 1217; Graving, *supra* note 72, at 292–293.

77. Zitter, *supra* note 71, at § 2(a).

78. Graving, *supra* note 72, at 290–294.

79. Mark Moedritzer, Kay Whittaker & Ariel Ye, *Judgments 'Made in China' But Enforceable in the United States?: Obtaining Recognition and Enforcement in the United States of Monetary Judgments Entered in China Against U.S. Companies Doing Business Abroad*, INT'L LAW., 44, 817, 820 (2010).

80. Graving, *supra* note 72, at 294.

81. *See* Ace Metal Fabricating Co. v. Arvid C. Walberg & Co., 135 Ill. App. 3d 452, 455 (2d Dist. 1985); Van Kooten Holding B.V. v. Dumarco Corp., 670 F. Supp. 227, 228 (N.D. Ill. 1987); Peters Prod., Inc. v. Desnick Broad. Co., 171 Mich. App. 283, 285 (1988); Jordan v. Hall, 115 N.M. 775, 777 (Ct. App. 1993). *See also* Willhite v. Willhite, 546 P.2d 612, 614 (Okla. 1976) (holding that the Uniform Foreign-Money Judgments Recognition Act was inapplicable to an action brought by a New York corporation to recover on a New York judgment against a Georgia resident); Mueller v. Payn, 30 Md. App. 377, 384 (1976) (holding that the Act only applies to judgments of countries outside the United States).

82. *See* Fairfield Lease Corp. v. Nielson, 1991 WL 85151, at *1 (Conn. Super. Ct. 1991); Jacoby v. Jacoby, 258 S.E.2d 534, 534–535 (1979); Salisbury Plumbing & Heating Co. v. Carpenter, 476 N.E.2d 15, 18–19 (5th Dist. 1985). *See also* Stevens v. Superior Court, 28 Cal. App. 3d 1, 4 (2d Dist. 1972) (holding that the Act authorized a post judgment stay of execution even though the money judgment was obtained in Oklahoma). Other courts have implicitly applied the Act to

was seen as a mere codification of common law decisions of comity in regards to recognition and enforcement.[83] One of the most important cases relating to common law recognition and enforcement dates back to the late 19th century in a case called *Hilton v. Guyot*.[84] In *Hilton*, the Supreme Court set forth the criteria for recognition of foreign judgments, refusing to recognize judgments that fail to meet its reciprocity requirement.[85] Since 1895, *Hilton*'s reciprocity requirement for recognition of foreign judgments has seen negative treatment by other courts[86] but has not been overruled, so it still applies today. However, due to the *Erie* doctrine, the recognition and enforcement of foreign court judgments, even in federal court, depends on state law.[87] Unfortunately, foreign jurisdictions are often reluctant to accept judicial decisions as evidence for the reciprocity that many of them require.[88]

In 2005, the National Conference of Commissioners on Uniform State Laws and the American Bar Association revised the 1962 Uniform Foreign Money Judgment Act, resulting in the 2005 Uniform Foreign Country Money Judgment Recognition Act (UFCMJRA).[89] Under the UFCMJRA, foreign judgments are presumptively entitled to recognition if they are final, conclusive, and enforceable where decided.[90] Like its predecessor, however, the presumption can be rebutted by certain mandatory and discretionary grounds for non-recognition.[91] The purpose of the revision was to clarify provisions and resolve problems created by the different court interpretations over the years.[92]

The UFCMJRA altered specific sections including the definitions, scope provision, burden of proof requirement, statute of limitations, and the actual procedure for recognition the act left to the states.[93] One key difference is the

---

involve judgments of sister states. *See* Bank of New York v. Cocozza, 1991 WL 225148, at *1 (Conn. Super. Ct. 1991); Brannick v. Genova, 1991 WL 28035, at *2 (Conn. Super. Ct. 1991); Elkhart Co-op. Equity Exch. v. Hicks, 823 P.2d 223. 226 (1991); Titan PRT Sys., Inc. v. Fabian, 1997 WL 27120, at *1 (Mass. Super. Ct. 1997); Ross v. Brewer, 805 P.2d 133, 135–135 (Okla. Ct. App. Div. 3 1991).

83. *See* Moedritzer, Whittaker & Ye, *supra* note 80, at 819.

84. Zeynalova, *supra* note 28, at 157.

85. *Hilton*, 159 U.S. at 210.

86. *See generally* de la Mata v. Am. Life Ins. Co., 771 F. Supp. 1375, 1380 (DE. Dist. Ct. 1991); Bata v. Bata, 163 A.2d 493, 505–506 (1960); Johnston v. Compagnie Generale Transatlantique, 152 N.E. 121, 123 (N.Y. 1926); Bank of Montreal v. Kough, 612 F.2d 467, 471 (9th Cir. 1980).

87. *See* Ramon E. Reyes, *The Enforcement of Foreign Court Judgments in the People's Republic of China: What the American Lawyer Needs to Know*, 23 BROOK. J. INT'L L. 241, 241–242 (1997). In *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 90 (1938), the Court decided the enforcement of foreign court judgments in the federal courts would be governed by state law. *Banque Libanise Pour Le Commerce v. Khreich*, 915 F.2d 1000, 1003 (5th Cir. 1990) is another case that followed this ruling.

88. Graving, *supra* note 72, at 291.

89. *Id.* at 289.

90. *Id.* at 299.

91. *Id.*

92. Zeynalova, *supra* note 28, at 158.

93. *Id.*

inclusion of the procedure for recognition into section six of the UFCMJRA. Section six of the UFCMJRA provides:

> (a) If recognition of a foreign-country judgment is sought as an original matter, the issue of recognition shall be raised by filing an action seeking recognition of the foreign-country judgment.
>
> (b) If recognition of a foreign-country judgment is sought in a pending action, the issue of recognition may be raised by counterclaim, cross-claim or affirmative defense.[94]

Through this provision, to decide the issue of recognition, the question must be raised in a court proceeding.[95] Furthermore, other changes included explicit allocation of burden of proof to the person seeking foreign judgment recognition[96] and it allowed some courts to apply its provisions retroactively to pending cases seeking foreign judgment enforcement.[97] The revisions prompted more states to implement it into its state laws, with over 30 states adopting either the original or revised version of the act.[98]

### C.  1964 UNIFORM ENFORCEMENT OF FOREIGN JUDGMENTS

As shown through the many acts that preceded the 1962 Uniform Act, there had been a continuous increase in the demand and effort for a standardized recognition and enforcement system for foreign judgments. Another attempt for uniform standards was made in 1964, when the United States enacted the Uniform Enforcement of Foreign Judgments Act (UEFJA), creating an expedited procedure for enforcing foreign judgments that are entitled to full faith and credit in the state.[99] Similar to its many predecessors, the UEFJA's purposes were to obtain prompt relief, obtain uniformity with rulings of sister state courts, give holders of a foreign judgment the same rights and remedies as holders of domestic judgments, and make foreign judgments easier to enforce.[100]

The UEFJA created an essential prerequisite of compliance within its provisions in order to seek enforcement of foreign judgment.[101] The UEFJA implemented the Full Faith and Credit Clause of the United States Constitution, which provides that full faith and credit must be given to the

---

94. Graving, *supra* note 72, at 300.

95. *Id.* at 300.

96. *Id.* at 301.

97. *See* DeJoria v. Maghreb Petroleum Expl., S.A., 935 F.3d 381, 387 (5th Cir. 2019) (holding that Texas law had adopted the retroactivity provision instituted in the UFCMJRA).

98. Coco, *supra* note 15, at 1217.

99. 30 AM. JUR. 2D EXECUTIONS, ETC. § 699 (2022).

100. 30 AM. JUR. 2D EXECUTIONS, ETC. § 695 (2022). *See also* Redondo Const. Corp. v. U.S., 157 F.3d 1060, 1065 (6th Cir. 1998) (citing Fairbanks v. Large, 957 S.W.2d 307, 308–310 (Ky. Ct. App. 1997)).

101. Lawrence Sys., Inc. *ex rel.* Douglas-Guardian Warehouse Corp. v. Superior Feeders, Inc., 880 S.W.2d 203, 208 (Tex. App. Amarillo 1994).

judicial proceedings of every other state.[102] Since only foreign judgments entitled to full faith and credit can be enforced,[103] by implementing the clause, the drafters hoped to facilitate the interstate enforcement of judgments in any jurisdiction where judgment is found.[104] But because the Full Faith and Credit Clause was automatically applied, it trumped local regulations on the procedures of state courts on enforcement and required that the state procedures be read narrowly so as to not defeat the purpose of the clause.[105]

Unlike the 1962 Uniform Act, though, the drafters did include a procedure in the UEFJA which specified how to obtain enforcement of foreign judgments. However, it has been held in many cases that the general rule is that the procedure under the act is optional and does not impair other remedies.[106] The UEFJA does not replace common law means of enforcing foreign judgments; rather, it provides an alternative and simplified method.[107] Not surprisingly, the divergence in the courts' ruling on whether or not the act is mandatory created issues as the UEFJA was intended to create uniform standards.

Demonstrated in Part II of this Note, the United States has attempted many times to address foreign judgment recognition and enforcement. While some were effective, none allowed mutual recognition and enforcement of foreign judgments with one of the top economies in the world, China. Although China is making an effort to lower its reciprocity principle, it has still been a challenge for people to enforce American judgments in Chinese courts.

## III.  CHINESE RULES ON FOREIGN JUDGMENT RECOGNITION AND ENFORCEMENT

The People's Republic of China's judicial system has long been seen as incompatible with Western notions of due process, and its judgments have often been unrecognized until its reforms in the late 1970s and early 1980s.[108] The Chinese economy first saw a need for stable and enforceable laws after the creation of the Special Economic Zones and the promulgation of the Law of the People's Republic of China on Chinese-Foreign Contractual Joint

---

102.  Hamwi v. Zollar, 702 N.E.2d 593, 597 (1998) (citing First Wisconsin Nat'l Bank v. Kramer, 560 N.E.2d 938, 941 (1990)).

103.  Padron v. Lopez, 220 P.3d 345, 347 (2009).

104.  Meyer v. First Am. Title Ins. Agency, 674 N.E.2d 496, 500–501 (1996).

105.  Nader v. Serody, 43 A.3d 327, 333–334 (D.C. 2012).

106.  Sara L. Johnson, *Validity, construction, and application of uniform enforcement of foreign judgments act*, 31 A.L.R.4ᵀᴴ 706 § 10. *See also* W.B.M. v. G.G.M., 579 S.W.2d 659, 661 (1979); Hill v. Gottwald, 358 N.Y.S.2d 883, 884 (1974); Producers Grain Corp. v. Carroll, 546 P.2d 285, 288 (Okla. App. 1976); Corning Truck & Radiator Serv. v. J. W. M., Inc., 542 S.W.2d 520, 525–526 (Mo. App. 1976). *See also* McGill v. Robbins, 329 S.W.2d 540, 541–542 (1959) (holding that failure to comply with the Uniform Act on Foreign Judgments was not decisive of the case).

107.  Indep. Bank v. Pandy, 383 P.3d 64, 67 (Colo. App. 2015).

108.  Moedritzer, Whittaker & Ye, *supra* note 80, at 823.

Ventures resulted in a drastic increase in foreign investment.[109] Foreigners were apprehensive of conducting business in China due to the uncertainty and unpredictability with Chinese law and practice that existed at that time.[110] China understood that in order to continue its economic growth, it needed to expand its judicial system to not focus solely on the Chinese businesses' preference of arbitration since many disputes are resolved in foreign courts.[111]

### A.  CIVIL PROCEDURE LAW OF 1982 AND ITS 1991 AMENDMENT

The next step towards a more impartial legal system occurred in 1982, when the Chinese legal system adopted the Constitution of the People's Republic of China.[112] The adoption of the Chinese Constitution demonstrated the country's increasing realization of the importance for human rights, due process, and an impartial legal system to its development.[113] This realization led to China adopting Civil Procedure Law of 1982, which, through Article 204, governed the country's recognition and enforcement of foreign judgments prior to its amendment in 1991.[114]

Article 204 provided that foreign judgment recognition and enforcement required entrustment by the foreign court to the Chinese court, the existence of an international treaty or reciprocity, and conformity with Chinese public policy.[115] Similar to the defects found in the United States' attempts for foreign judgment recognition and enforcement, Article 204 did not specify the review for its application, which greatly concerned non-Chinese attorneys.[116] It was the consensus among Chinese legal scholars that a procedural review based on Chinese law would apply.[117] If applied under Chinese law, it would mean that the Chinese courts would not look into the case's merits, facts of the case, nor the appropriateness as to the application of the law to the facts.[118]

In 1991, China adopted the Civil Procedure Law of the People's Republic of China, arguably one of China's most important steps towards an impartial legal system.[119] The law became the fundamental law governing civil proceedings and aimed "to protect the exercise of the litigation rights of the

---

109. Reyes, *supra* note 88, at 241–242.

110. *Id.* at 242.

111. *Id.* at 243.

112. Moedritzer, Whittaker & Ye, *supra* note 80, at 823.

113. Constitution of People's Republic of China, Mar. 11, 2018, art. 33 (recognizing that all Chinese citizens are equal before the law and declaring the importance for human rights), *available at* http://www.npc.gov.cn/npc/c505/201803/e87e5cd7c1ce46ef866f4ec8e2d709ea.shtml.

114. Reyes, *supra* note 88, at 244.

115. Constitution of PRC, *supra* note 114, art. 204.

116. Reyes, *supra* note 88, at 244.

117. *Id.* at 250.

118. *Id.*

119. Moedritzer, Whittaker & Ye, *supra* note 80, at 824.

parties, ensure that the people's courts ascertain facts, distinguish right from wrong, apply the law correctly, try civil cases promptly, affirm the rights and obligations in civil affairs, [and] impose sanctions for civil wrongs."[120] The law goes on further to provide, among other fundamental rights, that:

> (1) the parties to a civil lawsuit must have equal litigation rights; (2) the court must have personal jurisdiction over the defendant; (3) the parties have the right to have an attorney or agent represent them; (4) the defendant must receive notice of the proceedings; (5) the defendant must have the right to cross examine witnesses and present its own evidence and witnesses; and (6) the parties have the right to appeal a judgment of the trial court.[121]

In other words, the Civil Procedure Law was intended to reduce the uncertainty regarding these issues, and to provide a more efficient foreign judgment recognition and enforcement process.[122]

However, under the 1991 Civil Procedure Law, when denied recognition and enforcement, litigants found it difficult to obtain a new trial.[123] Additionally, the procedures for a new trial, if granted, were not standardized across regions.[124] This significant problem eventually led to the Civil Procedure Law's amendment in 2007.[125]

## B. CHINA'S ADOPTION OF THE NEW YORK CONVENTION

In 1987, China adopted the New York Convention and it is now the country's principle international treaty for foreign arbitral awards.[126] Article V of the New York Convention contains an exhaustive list of the grounds for not recognizing and enforcing an arbitral award.[127] Although China has adopted the New York Convention, China only applies it on the basis of reciprocity to the recognition and enforcement of arbitral awards made in member states and non-member states.[128] For foreign arbitral awards rendered in a member state of the New York Convention, the Chinese court

---

120. *Id.* at 824 (quoting from CIVIL PROCEDURE LAW, art. 2 (China) (promulgated and adopted by Order No. 44 of the President of the People's Republic of China, Apr. 9, 1991)).

121. Moedritzer, Whittaker & Ye, *supra* note 80, at 824. *See* CIVIL PROCEDURE LAW, arts. 8, 22, 50, 64, 66, 77–78.

122. Reyes, *supra* note 88, at 244.

123. Moedritzer, Whittaker & Ye, *supra* note 80, at 824.

124. *Id.*

125. Li Yongmei, *Perfection of Civil Retrial and Enforcement & Consistency among Laws – Amendments to PRC's Civil Procedure Law*, KING & WOOD MALLESONS (Apr. 24, 2008), https://www.chinalawinsight.com/2008/04/articles/dispute-resolution/perfection-of-civil-retrial-and-enforcement-consistency-among-laws-amendments-to-prcs-civil-procedure-law.

126. Fan Kun, *Arbitration in China: Practice, Legal Obstacles and Reform*, 19 ICC INT'L CT. ARB. BULL. 25, 32 (2008).

127. *Id.*

128. Christina Cheung, *The Enforcement Methodology of Non-Domestic Arbitral Awards Rendered in the United States & Foreign-Related Arbitral Awards Rendered in the People's Republic of China Pursuant to Domestic Law and the New York Convention*, 11 SANTA CLARA J. INT'L L. 237, 259 (2012).

will rely on the New York Convention.[129] If the award was rendered in a non-member state, the Chinese Court will rely on reciprocity.

China's adoption of the New York Convention created two main issues: (1) the relationship between treaties with Chinese domestic law and (2) whether the New York Convention can be applied directly in Chinese courts.[130] The Chinese constitution does not provide the status of treaties in domestic law; but instead, a treaty's application is generally governed by Article 142 of the General Principles of Civil Law and Article 260 of the 2012 Civil Procedure Law.[131] Except for treaty provisions China specifically reserved for, when the provision is inconsistent with domestic law, the treaty provision prevails.[132] The unclear part is whether that treaty provision will still prevail with the last-in-time doctrine, which generally gives priority to treaties in the People's Courts and prevents later legislation from contradicting its treaty obligations.[133] China's fundamental opposition towards Western ideologies will also add to the complications.[134] Regarding the second issue, the court has to see if it even has judicial authority to apply the treaty. Without legislative action to give meaning to the treaties, treaties confer no rights cognizable in the courts.[135] Chinese courts are also known to be ineffective in enforcing arbitral awards due to societal and institutional reasons, including, but not limited to, low quality of judges, lack of judicial dependence, administrative intervention, and bias toward foreign parties.[136]

These societal and institutional issues should be alarming to the parties seeking to enforce arbitration awards in China. While many people in China do choose to take the arbitration route, some sort of recognition and enforcement beyond reciprocity for civil judgments must be implemented in China to incentivize additional business and facilitate economic growth.

### C.  CHINA'S REFUSAL OF FOREIGN JUDGMENT RECOGNITION AND ENFORCEMENT

Chinese courts generally refuse to recognize and enforce foreign judgments, and this refusal has been attributed to three primary reasons.[137]

---

129. Jingzhou Tao, *Salient Issues in Arbitration in China*, 27 AM. U. INT'L L. REV. 807, 822 (2012).

130. Mo Zhang, *Enforceability: Foreign Arbitral Awards in Chinese Courts*, 20 SAN DIEGO INT'L L.J. 1, 10 (2018).

131. *Id.*

132. *Id.*

133. *Id.* at 11.

134. Michael I. Kaplan, *Solving the Pitfalls of Impartiality When Arbitrating in China: How the Lessons of the Soviet Union and Iran Can Provide Solutions to Western Parties Arbitrating in China*, 110 PENN ST. L. REV. 769, 797 (2006).

135. Zhang, *supra* note 131, at 10.

136. Cheung, *supra* note 129, at 259–260.

137. Jianli Song, *Recognition and Enforcement of Foreign Judgments in China: Challenges and Developments*, CHINA INT'L COM. CT. (Aug. 30, 2018), http://cicc.court.gov.cn/html/1/219/199/203/1048.html.

First, not many countries have entered into bilateral treaties of judicial assistance with China, including major trading partners such as the United States, the United Kingdom, Japan, and India.[138] Second, China has signed and ratified the New York Convention, and as a result, parties are more likely to choose arbitration to settle civil and commercial disputes rather than attempt litigation.[139] Third, and perhaps the most important, Chinese courts have adopted the principle of substantial reciprocity, requiring that other countries recognize Chinese judgments as a precedent in order for Chinese courts to recognize and enforce that country's judgment.[140]

As of 2020, China has entered into 39 bilateral treaties on recognition of foreign judgments, with only two not entered into force.[141] Some countries refuse to recognize and enforce foreign judgments in the absence of a bilateral treaty, whereas other countries, like China, require reciprocity.[142] Part of the reason why China has not entered into many bilateral treaties is its strict adherence to its reciprocity system. China's reciprocity system is considered one of the most restrictive in the world and regularly utilized to deny foreign judgment recognition and enforcement.[143] If the court that rendered the decision failed to previously recognize a Chinese judgment, then reciprocity would be denied.[144] China's reciprocity recognition and enforcement system has been so stringent that there has only been 15 total court decisions involving foreign judgment recognition and enforcement between the United States and China.[145] There are seven cases where Chinese courts reviewed a United States judgment, and of those seven cases, the Chinese courts denied almost half on lack of reciprocity.[146]

Chinese courts have only recognized and enforced two judgments rendered in the United States that sought recognition and enforcement in China. The first time China recognized a United States judgment was in *Liu Li v. Taoli & Tongwu*.[147] In 2017, the Wuhan Intermediate People's Court recognized and enforced a default judgment entered by the Los Angeles Superior Court.[148] In the Chinese court's decision, it reasoned that there was

---

138. *Id.*

139. *Id.*

140. *Id.*

141. Guodong Du & Meng Yu, *List of China's Cases on Recognition of Foreign Judgments*, CHINA JUST. OBSERVER (last updated June 8, 2021), https://www.chinajusticeobserver.com/a/list-of-chinas-cases-on-recognition-of-foreign-judgments.

142. Coco, *supra* note 15, at 1231.

143. Reyes & Tan, *supra* note 17, at 44.

144. Coco, *supra* note 15, at 1231.

145. Du & Yu, *supra* note 142.

146. *Id. See generally* Zinian Zhang, *Globalized Cross-Border Insolvency Law: The Roles Played by China*, EUR. BUS. ORG. L. REV. (2021).

147. *See* Liu Li v. Tao Li and Tong Wu, 2005, Wuhan City Interm. People's Ct. No. 026, June 30, 2017 (China).

148. *See* Suni Gong, *The Chinese Court's Enforcement of a U.S. Civil Judgement*, CTR. FOR TRANSNAT'L LITIG. & COM. L.: TRANSNAT'L NOTES (Apr. 17, 2018), https://blogs.law.nyu.edu/

no evidence that the United States lacked jurisdiction to hear the case and recognition and enforcement would not violate the fundamental reciprocity principles of Chinese laws.[149] The Wuhan Court used a Chinese judgment the United States recognized in the past[150] and reasoned that the *Robinson* case set a precedent for recognition and enforcement of civil rulings of Chinese judgments in the United States.[151] In 2018, in *Nalco Co. v. Chen*, the Intermediate People's Court of China recognized and enforced a civil judgment rendered by a United States federal court for a second time. The Shanghai court rejected defendant's argument that the United States summary judgment procedures were incompatible with Chinese law.[152] Unlike other Chinese courts, the Shanghai court decided to treat the entire United States as a single jurisdiction to satisfy China's reciprocity principle.[153]

Although foreign judgment recognition and enforcement by two Chinese courts is a positive, other higher Chinese courts are not required to follow the Wuhan nor Shanghai court's ruling and could decide to not recognize *Robinson* as precedent. By signing and ratifying the 2019 Judgment Convention, businesses in each country do not have to worry about unpredictability of Chinese courts' decisions. With more protection and assurance, businesses would be more inclined to take higher risks that could lead to very lucrative increases in each economy.

As demonstrated in Part III, China has a long history of policies and systems that are incompatible with the Western ideology of due process. China values reciprocity, while the United States values jurisdiction and civil procedure. Unless China increasingly shifts towards an even more impartial judicial system, without a binding, bilateral treaty, businesses will continue to have a difficult time enforcing their United States judgments in Chinese courts. By each country signing and ratifying the convention, it would create a streamlined and effective process of judgment recognition and enforcement that has been attempted—and failed—many times before.

---

transnational/2018/04/the-chinese-courts-enforcement-of-a-u-s-civil-judgement/ (describing Liu Li v. Taoli & Tongwu and China's previous history of denying recognition to U.S. judgments).

149. Song, *supra* note 138.

150. Hubei Gezhouba Sanlian Indus. Co. v. Robinson Helicopter Co., 425 F. App'x 580 (9th Cir. 2011). In *Robinson*, the 9th Circuit recognized and enforced a Chinese judgment against the Appellant since it was in the best interest of protecting the integrity of the judicial process and Appellant failed to demonstrate other grounds for refusal outside of California's UFMJRA.

151. Gong, *supra* note 149.

152. William S. Dodge & Wenliang Zhang, *Reciprocity in China-U.S. Judgments Recognition*, 53 VAND. J. TRANSNAT'L L. 1541, 1552 (2020).

153. *Id.* at 1553.

## IV. THE "GAME-CHANGER": CONVENTION OF 2 JULY 2019 ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN JUDGMENTS IN CIVIL OR COMMERCIAL MATTERS

The Hague Conference on Private International Law adopted the new 2019 Judgment Convention, which is essentially a broadened version of the 2005 Hague Convention.[154] As discussed, the 2005 Hague Convention narrowed its scope by providing direct rules on jurisdiction.[155] The 2019 Judgment Convention took a broader approach and expanded its scope to include more than just recognition and enforcement of judgments with exclusive choice of court agreements.[156]

Described as a "game-changer"[157] in foreign judgment enforceability, the 2019 Judgment Convention is important to anyone with a cross-border private or business relationship because it ensures that successful litigants can vindicate their judicial rights through a simple and predictable recognition and enforcement of civil judgments.[158] The convention intends to provide a legal framework that has certain and predictable outcomes, with shortened timeframes and lower costs.[159] It includes, among others, provisions on the scope of recognizable judgments, the parties that may apply for recognition and enforcement, the recognition procedure, and grounds for refusal.[160]

Some of the 2019 Judgment Convention's noticeable improvements are with reciprocity and expanding its scope, which address frequent issues associated with foreign recognition of U.S. judgments.[161] Unlike the previous treaties, the 2019 Judgment Convention does not limit personal jurisdiction of the countries that participate in the convention and has rules that are largely consistent with the U.S. Uniform Acts and the rules in China.[162] Instead, it is based on reciprocity to achieve its purpose of predictable outcomes with shortened timeframes and costs. Having a reciprocal requirement in a treaty between China and the United States could remove China's strict barrier on foreign recognition and enforcement.[163] Although not widely signed nor ratified, if countries such as the United States and China and regional

---

154. Coco, *supra* note 15, at 1234–1235.

155. *Id.* at 1235.

156. Brand, *supra* note 31, at 276.

157. *Id.* at 290 (quoting *Gamechanger for Cross-Border Litigation in Civil & Commercial Matters to be Finalized in the Hague*, HCCH (November 12, 2020), https://www.hcch.net/en/news-archive/details/?varevent=683).

158. *Gamechanger for Cross-Border Litigation in Civil & Commercial Matters to be Finalized in the Hague*, HCCH (November 12, 2020), https://www.hcch.net/en/news-archive/details/?varevent=683.

159. *Id.*

160. Hague Conference, *supra* note 18.

161. Coco, *supra* note 15, at 1240.

162. Dodge & Zhang, *supra* note 153, at 1581.

163. Coco, *supra* note 15, at 1240, 1241.

organizations like the European Union become parties to the Convention, it would likely increase the level of ratification and accession.[164]

Enforcement of U.S. judgments in China has been very challenging, with a large percentage of judgments not enforced.[165] Numerous attempts have been made to try and address this issue through international conventions[166] or statutory enactment,[167] but none appear to create a solution. Instead of initiating an extremely time-consuming bilateral treaty between China and the United States, both countries should sign and ratify the 2019 Judgment Convention in order to protect both countries' business interests and to allow continued expansion in their respective economies.

Skeptics may question why this 2019 Judgment Convention is any different than the previous Hague Conventions or statutes. To simplify the answer, in addition to the drawbacks mentioned above, those conventions and statutes were too forward-thinking for its time. The first case sought to be enforced in either country was brought in 2009, four years after the 2005 Hague Convention.[168] It was not until 2015, 10 years later, that either country recognized and enforced a foreign judgment from the other country.[169] To date, the United States courts have reviewed eight cases involving recognizing and enforcing a Chinese judgment but has only recognized and enforced five.[170] China has reviewed seven U.S. judgments and only recognized and enforced two.[171] Although the Wuhan Court decided *Robinson* set precedent to satisfy its reciprocity principle, that does not mean other Chinese courts will follow.

Instead of relying on an uncertain and unpredictable system for foreign judgment recognition and enforcement, signing and ratifying the convention

---

164. Brand, *supra* note 31, at 290.

165. Arthur Anyuan Yuan, *Enforcing and Collecting Money Judgments in China from a U.S. Judgment Creditor's Perspective*, 36 GEO. WASH, INT'L L. REV. 757, 758 (2004).

166. *See, e.g.*, Hague Conference on Private International Law, Statute of the Hague Conference on Private International Law, entered into force on July 15, 1955, https://www.hcch.net/en/ instruments/conventions/full-text; Hague Conference on Private International Law, Convention of 1 February 1971 on the Recognition and Enforcement of Foreign Judgments in Civil and Commercial Matters, concluded on February 1, 1971, https://www.hcch.net/en/instruments /conventions/full-text/?cid=78; Hague Conference on Private International Law, Convention on Choice of Court Agreements, concluded on June 30, 2005, https://assets.hcch.net/docs/510bc238-7318-47ed-9ed5-e0972510d98b.pdf.

167. *See e.g.* Unif. Foreign Money-Judgments Recognition Act (UNIF. LAW COMM'N 1962); National Conference of Commissioners on Uniform State Laws, Uniform Enforcement of Foreign Judgments Act, concluded on August 8, 1964, https://www.uniformlaws.org/HigherLogic/System/ DownloadDocumentFile.ashx?DocumentFileKey=89cb1e6c-ffe8-c48d-e7b9-8335ed3726af&forc eDialog=0.

168. Du & Yu, *supra* note 142.

169. *See* Glob. Mat. Techs., Inc. v. Dazheng Metal Fibre Co., 133 F. Supp. 3d 1079 (N.D. Ill. 2015).

170. Du & Yu, *supra* note 142.

171. *See* Nalco Co. v. Chen, 843 F.3d 670 (7th Cir. 2017); Liu Li v. Tao Li and Tong Wu, 2005, Wuhan City Interm. People's Ct. No. 026, June 30, 2017 (China).

removes the concern of reciprocity between the two countries.[172] From the United States perspective, the 2019 Judgment Convention would benefit United States businesses in two additional ways. First, the 2019 Judgment Convention will essentially "lock-in" improvements in domestic law that creates a predictable floor for its applicability and will allow enforcement even if the law changes.[173] If countries decide to strengthen their reciprocity requirement, this "lock-in" would prevent detrimental effects on U.S. businesses.[174] The second benefit of the 2019 Judgment Convention is that the signing and ratifying of the convention will allow for more transparent rules for foreign judgment recognition and enforcement.[175] Even if the law on recognition and enforcement changes, with the lock-in effect, the United States will still have a clear and transparent set of rules to follow when recognizing and enforcing foreign judgments. This provides a significant improvement over the current situation, allowing businesses to save on hiring local attorneys to determine whether their U.S. judgment would be enforceable in a foreign country.[176] Although the second benefit of transparent rules would also benefit China, it would be compelled to join the convention simply because of the increasing need to export Chinese judgments abroad.[177] Not only has there been the establishment of China's international commercial courts, but also, China's Belt and Road Initiative is expanding.[178] Because the 2019 Judgment Convention is an international treaty, it has global reach and applicability that would likely complement and support the facilitation of the Belt and Road Initiative.[179] Both China and the United States actively participated in the negotiation of the 2019 Judgment Convention;[180] so, there is clearly interest from both sides to join the convention as they both likely understand the financial benefits that could arise from their participation.

**CONCLUSION**

International business has grown exponentially in the past 40 years. China's decision to open its economy through its legal reforms in the late 1970s and early 1980s coincided with a significant increase in the globalization of the world economy that greatly benefited both the United

172. Coco, *supra* note 15, at 1242.
173. *Id.*
174. *Id.*
175. *Id.* at 1243.
176. *Id.*
177. Dodge & Zhang, *supra* note 153, at 1581.
178. *Id.* China's Belt and Road Initiative is a global development strategy to invest in countries and international organizations with measures to provide a legal environment by promoting judgment recognition of countries along the Belt and Road.
179. *Id.*
180. *Id.*

States and China.[181] As international trade continues to expand, this significantly raises the potential of more civil conflicts that warrant judicial review. If the countries could both agree to ratify and sign the 2019 Judgment Convention, it will lessen the restrictiveness of China's reciprocity policies and the United States' jurisdictional concerns and provide protection incentivizing businesses to expand trade between the two countries. Signing and ratifying the 2019 Judgment Convention would revolutionize judgment recognition and enforcement between the United State and China.[182] Similarly, like the reforms made almost half a century ago, another major legal reform by China could lead to another dramatic influx of international trade that again benefits the United States and China's economy. China's approximate population of 1.3 billion people provides an endless source of economic potential for Western businesses.[183] China has reached the top of the global economy aided largely by joint ventures with Western entities.[184] The businesses—and economies—of the United States and China both reap great benefits when the two countries work together. It is time for the United States and China to push politics aside and sign and ratify the 2019 Judgment Convention to allow a mutual recognition and enforcement of each country's civil judgments for the betterment and advancement of their respective economies.

*Shun-Hsiang Chen*[*]

---

181. Xiaowen Qiu, *Enforcing Arbitral Awards Involving Foreign Parties; A Comparison of the United States and China*, 11 AM. REV. INT'L ARB. 607, 607 (2000).

182. Dodge & Zhang, *supra* note 153, at 1544–1545.

183. Kaplan, *supra* note 135, at 783.

184. *Id.*

* B.A., University of California, Irvine, 2017; J.D. Candidate, Brooklyn Law School, 2022. Thank you to the editors and staff of the Brooklyn Journal of Corporate, Financial & Commercial Law for their efforts in preparing this Note for publication. To my brothers, thank you for being there when times are difficult.